

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**ENTERED**
**12/31/2014**

| | | |
|---|---|---|
| IN RE: | § | |
| RAPID-TORC, INC. | § | |
| | § | |
| DEBTOR(S) | § | CASE NO. 12-39217-H5-11 |
| | § | |

## MEMORANDUM  OPINION

This is a contested matter. At issue is whether plaintiffs, two pre-petition creditors of debtor Rapid-Torc, Inc. (RTI), may sue two other pre-petition creditors of debtor post-confirmation in state court, or whether plaintiffs' settlement with the purchaser of RTI or other orders of this Court foreclose plaintiffs' state case. Before the Court are two motions. In the first motion  Atlas Copco Tools and Assembly Systems, LLC (Atlas), the purchaser of RTI's assets pursuant to an Asset Purchase Agreement (APA) and the confirmed plan, moves to enforce against plaintiffs, Dynamic Tools, Inc. and Hytorc (Dynamic/Hytorc), a division of Unex Corporation, the court order approving the mediated settlement agreement, as well as other orders of this Court.  Specifically, Atlas seeks to enforce the: (1) Order regarding the Mediated Settlement Agreement (Doc. 207-2, filed 10-21-13) (Settlement Agreement); (2) Order Approving Sale

of Assets Free and Clear of Liens, Claims, Interests and Encumbrances under 11 U.S.C. § 363 (Doc. 78, filed 3-15-13) (Sale Order); (3) Order Vacating Prior Order dated March 15, 2013 and Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases (Docs. 138 &139, filed 4-18-13) (Assumption Order); and (4) Order confirming Plan of Reorganization and Approving Adequacy of Disclosure Statement (Doc. 163, filed 6-18-13) (Confirmation Order).

In the second motion, Dynamic/Hytorc contends this Court has no jurisdiction over Atlas' motion and  objects to the motion on its merits. In the alternative, Dynamic/Hytorc moves this Court to abstain from hearing the motion pursuant to 28 U.S.C. §1338(c)(2).

The parties appeared at a hearing and argued the motions. Only Atlas offered witness testimony. After considering the testimony, exhibits, and law, the Court concludes  Atlas' motion should be granted and  Dynamic/Hytorc's motion should be denied for the following reasons:

## I. Jurisdiction

### (a) Authority to enter a Final Judgment.

Dynamic/Hytorc denies this Court has either subject matter jurisdiction

2

or constitutional authority to enter a final judgment this dispute. The Supreme Court in *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2172 (2014) recently resolved the question of a bankruptcy court's statutory and constitutional authority to enter a final judgment:

> Put simply: If a matter is core, the statute empowers the bankruptcy judge to enter final judgment on the claim, subject to appellate review by the district court. If a matter is non-core, and the parties have not consented to final adjudication by the bankruptcy court, the bankruptcy judge must propose findings of fact and conclusions of law. Then, the district court must review the proceeding *de novo* and enter final judgment.

Consequently, any findings or rulings by this Court may be considered either proposed findings under 28 U.S.C. § 157(c)(2), reviewable by the district court, or final resolutions, appealable to the district court pursuant to 28 U.S.C. §158. In light of *Executive Benefits*, this Court concludes that its findings and rulings should be considered either final rulings on the motions or as recommendations to the district court to the extent necessary for constitutional jurisdiction.

### (b) Post-confirmation subject matter jurisdiction.

Dynamic/Hytorc contends that Atlas' motion fails to satisfy subject matter jurisdiction under 28 U.S.C. §§ 157 (c)(1) and 1334(b). 28 U.S.C. § 157 (c)(1)

reads:

> A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11.  In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

Under 28 U.S.C. § 1334(b), a federal district court has original but not exclusive jurisdiction of all civil proceedings "arising under or arising in or related to cases under title ll."  As explained by the Supreme Court:

> Congress did not delineate the scope of "related to" [FN5] jurisdiction, but its choice  of words suggests a grant of some breadth. The jurisdictional grant in § 1334(b) was a distinct departure from the jurisdiction conferred under previous Acts, which had been limited to either possession of property by the debtor or consent as a basis for jurisdiction. See S. Rep. No. 95-989, 2nd Sess., pp. 153, 154 (1978) U.S. Code Cong. & Admin. News 1978, pp. 5787, 5939, 5940. We agree with the views expressed by the Court of Appeals for the Third Circuit in *Pacor, Inc. v. Higgins,* 743 F.2d 984 (1984), that "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate," *id.,* at 994; *see also* H.R.Rep. No. 95-595, pp. 43-48 (1977), and that the "related to" language of § 1334(b) must be read to give district courts (and bankruptcy courts under § 157(a)) jurisdiction over more than simple proceedings involving the property of the debtor or the estate....

FN5. Proceedings "related to" the bankruptcy include (1) causes of action owned by the debtor which become property of the estate pursuant to 11 U.S.C. § 541, and (2) suits between third parties which have an effect on the bankruptcy estate. *See* 1 Collier on Bankruptcy ¶ 3.01[1] [c] [iv], p. 3-28 (15th ed. 1994).

*Celotex Corp. v. Edwards*, 514 U.S. 300, 307-308  (1995).

Dynamic/Hytorc contends there is no estate left for this Court to administer. Consequently, there remains no jurisdiction in the federal courts.

Section 1123(b)(3) of the Bankruptcy Code authorizes a non-individual Chapter 11 plan to provide for: (A) "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or (B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest."

In *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390 (5th Cir. 2001) the Fifth Circuit concluded  the only remaining post-confirmation jurisdiction for the bankruptcy court is for "the implementation or execution of the plan." However,  the Court further explained in *In re Enron Corp. Securities*, 535 F.3d 325, 335 (5th Cir. 2008), "the facts  in *Craig's Stores* were narrow."  In reviewing the details of the  *Craig's* case, the Fifth Circuit noted "three factors

5

were critical to the court's denial of post-confirmation jurisdiction: first, the claims at issue 'principally dealt with post-confirmation relations between the parties'"; second, "[t]here was no antagonism or claim pending between the parties as of the date of the reorganization"; and third, "no facts or law deriving from the reorganization of the plan [were] necessary to the claim." Applying the three elements to the *Enron* facts, the Fifth Circuit held the district court had post-confirmation jurisdiction where the dispute involved pre-confirmation events and the dispute was raised pre-confirmation. Since these two factors weighed heavily in favor of federal jurisdiction, the Fifth Circuit was unconcerned with the third *Craig's* factor, involvement of facts or law deriving from the reorganization plan as necessary to resolve the claims.

Similarly, in *In re U.S. Brass Corp.*, 301 F.3d 296, 305 (5th Cir. 2002), the court upheld post-confirmation district court jurisdiction over a dispute between debtor's suppliers and debtor's insurance company, concluding that "the proceeding would ultimately impact compliance with or completion of the reorganization plan." Consequently, this Court must consider both the language of the RTI confirmed plan and the impact of plaintiffs' New Jersey lawsuit on

the reorganized debtor.

### (c) Post-confirmation Jurisdiction Retained in the Amended Plan.

The  Order confirming Debtor's disclosure statement and amended plan, retains exclusive  jurisdiction of the RTI case  in this Court for all purposes set forth in  the  plan  and  for  purposes  provided  in  11  U.S.C.  §§  1127(b) (Modification of  Plan)  and 1142 (Implementation of Plan) and Bankruptcy Rule 3020(d).[1] (Doc. 163). Dynamic/Hytorc did not appeal this or any other order of this Court.

Section 8 of the confirmed amended plan reserves exclusive jurisdiction in the bankruptcy court after the effective date:

8.1.1 to insure that the purpose and intent of the Plan are carried out;
. . .

8.1.3 to hear and determine all Objections to Claims, controversies, motions, applications, suits and disputes that may be pending at or initiated after the Effective Date;
. . .

---

[1] Rule 3020(d) **Retained Power**. Notwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate."

The Rapid-Torc case remains open due to this matter and because substantial monies remain in trust for distribution to creditors after other  disputes are resolved by this Court.

8.1.7 to hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation, execution, or enforcement of the Plan or this Court's orders entered in this case, including, but not limited to, the order approving sale of assets free and clear of liens [Docket No. 139] and the order authorizing the assumption and assignment of executory contracts and unexpired leases [Docket No. 138];

. . .

8.1.9 to enforce and interpret by injunction or otherwise the terms and conditions of the Plan;

. . .

8.1.12 to consider and act on such other matters consistent with the Plan as may be provided in the Confirmation Order;

8.1.13 to issue orders in aid of execution and implementation of this plan to the extent authorized by 11 U.S.C. § 1142 or provided by the terms of this Plan;

. . .

8.1.15 to enforce the mediated settlement agreement by and between RTI and Dynamic Tools, Inc. Jetyd Corporation, Jetd, HyTorc and John Junkers dated April 17,2013.

(Doc. 168 p. 15)

<u>(d) Dynamic/Hytorc's  New Jersey state suit</u>

The last question is whether the plaintiffs' post-confirmation state case impacts compliance with or completion of the reorganization plan. Approximately one month after RTI's plan was confirmed, Dynamic/Hytorc sued Triad Tool Company, a New Jersey corporation, (Triad) and Nazareth

Machine Works, Inc., a Pennsylvania company, (Nazareth) in a New Jersey state court. In its complaint, Dynamic/Hytorc contends in July 2003 it made what it calls a "private label" agreement with RTI to license Hytorc's hydraulic torque wrenches to be manufactured by Triad and Nazareth and to be sold under the RTI name.

Plaintiffs allege:

The private label agreement functioned as follows: The tools and spare parts were manufactured by Triad and Nazareth at Dynamic's request, and then were sent by those companies to Dynamic, which kept them in stock. Dynamic would pay Triad and Nazareth for the products delivered. Ample quantities of tools and spare parts were required to be kept in stock at all times because the tools are utilized in the maintenance of heavy industrial equipment and infrastructure and must be available for immediate delivery. When quantities of the tools/spare parts kept in stock became low, Dynamic would request that Triad or Nazareth produce more. Rapid-Torc would place orders by issuing purchase orders to Dynamic, indicating quantities and agreed upon prices for the tools/spare parts. Rapid-Torc would be required to pay Dynamic the agreed upon price.

(Doc. 207 Ex. 3)

Plaintiffs describe how they discovered Triad and Nazareth's involvement with debtor:

During the course of the bankruptcy proceeding, in or about January 2013, Rapid-Torc filed certain schedules that listed all of its

9

creditors and the amounts due.

To Plaintiffs' surprise, Triad and Nazareth were listed on the schedules as creditors of Rapid-Torc.

By information and belief, Triad and Nazareth had no independent relationship with Rapid-Torc. The only plausible explanation for either company being owed money by Rapid-Torc was that after Dynamic ceased selling products to Rapid-Torc, Triad and Nazareth began selling the same products to Rapid-Torc directly. As both companies are well-aware, the designs for such products belong to Hytorc. Hytorc has confronted Triad and Nazareth with its suspicions, neither of which has denied that they have supplied Rapid-Torc directly with the same products previously manufactured by them on behalf of Dynamic.

(Doc. 207)

Plaintiffs allege RTI stole plaintiffs' designs and used them to order tools from Triad and Nazareth, which then filled the RTI orders, allegedly knowing that the designs originally came from Dynamic/Hytorc. Plaintiffs sue Triad and Nazareth for misappropriation of trade secrets, conversion, "trade secret disclosed or used wrongfully," unfair competition, and "intentional interference with prospective economic advantage." *Id.* Dynamic/Hytorc seeks to enjoin Triad and Nazareth from using what it contends belong to plaintiffs and not RTI..

Triad and Nazareth appeared in the New Jersey case and removed it to the

United State District Court for  New Jersey, which referred the matter to

Honorable Rosemary Gambardella, United States Bankruptcy Judge.  Plaintiffs

moved to remand.   The parties participated in a mediation which was

unsuccessful.

 (e) Conclusion-- The federal courts have exclusive post-confirmation

jurisdiction.

After reviewing the Fifth Circuit rulings in *Craig's, Enron,*  and *US

Brass,* this Court finds the United States District Court for the Southern District

of Texas has supplemental federal jurisdiction and, specifically, exclusive post-

confirmation jurisdiction over the dispute between Dynamic/Hytorc, Nazareth,

Triad, and Atlas for several reasons. First, Dynamic/Hytorc sues Nazareth and

Triad based on a dispute directly related to assets of  RTI  sold by order of this

Court. Second,  Dynamic/Hytorc discovered its  alleged claims against RTI,

Triad, and Nazareth pre-confirmation. Third, the facts and law related to the

confirmed amended plan along with the other orders of this Court are critical to

the dispute. Fourth, Atlas contends and this Court agrees, Dynamic/Hytorc's

post-confirmation state case has a direct, immediate, and continuing impact on

the reorganization plan. Fifth,  Dynamic/Hytorc's failure to raise its alleged ownership claims to RTI's intellectual property during the bankruptcy presents issues of bad faith, waiver, and judicial estoppel.

The Chapter 11 plan  provides for exclusive jurisdiction in  the bankruptcy court  to hear, among other matters, all disputes related to the plan and the mediated settlement between Dynamic/Hytorc and all other principal parties in the case. (Doc. 207-3 p. 83). The Order approving the Mediated Settlement specifically binds Dynamic Hytorc to "support debtor's efforts to sell the assets to Atlas Copco Tools and  Assembly Systems, LLC"  and "not to disparage any of the parties through any means, written or verbal." (Doc. 207-1 p. 5-6). Plaintiffs' New Jersey law suit requires interpretation of the Mediated Settlement and other orders of this Court.

Moreover, this Court has the jurisdiction to interpret its own orders. *Travelers Indemnity Co. v. Bailey,* 557 U.S. 137, 151 (2009) (Bankruptcy Court "plainly had jurisdiction to interpret and enforce its own prior orders."); *Republic Supply v. Shoaf,* 815 F.2d 1046, 1054 (5th Cir. 1987) (Bankruptcy Court has jurisdiction to determine whether confirmed plan releasing guaranty

barred subsequent suit on same guaranty). Given the exclusive jurisdiction retained in the confirmed plan, only the federal court has jurisdiction to consider these issues.

## II. The parties and their businesses

### (a) Dynamic/Hytorc

Hytorc is a owner of various designs for industrial tools. Dynamic is an affiliated company. Hytorc does not manufacture its own products; instead, it sends its designs to various jobbers or suppliers and orders tool components or assembled tools to be manufactured.

Roger Dischert was an employee of Dynamic/Hytorc for many years. In approximately 2003, Dischert agreed with John Junker, principal of Dynamic/Hytorc, to create another company, Rapid Torc, Inc.  Dischert and Junker agreed RTI would have Dynamic place RTI purchase orders with Nazareth and Triad using the Dynamic/Hytorc designs. (Court's Ex. 2-18).  The "Rapid Torc, Inc." logo would be imprinted on the resulting tools or tool parts. RTI would pay Dynamic/Hytorc and the tools would be shipped to RTI in Houston and, later, its Pasadena, Texas warehouse. *Id.*

RTI and Dynamic/Hytorc had no formal agreement or license defining their business relationship. At the hearing, Dynamic/Hytorc offered no written agreement setting out the ownership of either the Dynamic/Hytorc designs or any future RTI designs. (Doc. 282 p. 19).

From 2008 to 2011, Dynamic/Hytorc sold over $13 million in hydraulic torque wrenches and accessories to RTI.[2] RTI paid $10.4 million for these tools. When RTI sent payments, Dynamic/Hytorc would apply those payments to the oldest, outstanding RTI invoices. Dynamic/Hytorc would only ship additional inventory to RTI in the amount of the payment received and applied to the oldest invoice. *Id.*

Sometime in 2009-2011, RTI defaulted on its payments to Dynamic. On November 22, 2011, Dynamic sued RTI in Harris County, Texas for breach of contract and for collection on a sworn account. Dynamic sought to recover $2,160,327.87 for hydraulic torque wrenches and associated parts shipped from Dynamic to RTI from December 2009 to June 2012.

The state court granted Dynamic's summary judgment in its collection

---

[2] *See* Dynamic's motion for summary judgment filed in its Harris County case against RTI. Court's Ex. 2-18.

case against RTI.  On May 18, 2012, the Harris County Court awarded Dynamic a judgment for $2,451,182.51 in damages, plus attorneys fees, costs and interest. RTI appealed. In June 2012, Dynamic's judgment was abstracted in Harris County. (Court Exhibit 2-23).

When RTI filed bankruptcy on December 14, 2012, it scheduled its inventory in its Pasadena, Texas warehouse at a value of approximately $1,670,895.  At the same time, Dynamic/Hytorc held RTI inventory it valued at $1.4 million. (Doc. 41 p.5).  On May 18, 2012, Dynamic received a judgment in its collection case for $2,451,182.51 in damages, plus attorneys fees, costs and interest. In June 2012, this judgment was abstracted in Harris County. (Court Ex. 2-23).

Rapid Torc listed both "Nazarette" (Nazareth) ($46,807.27) and "Triad" (Triad) ($408,780) as unsecured creditors in bankruptcy Schedule F as originally filed and as amended. (Docs. 37 & 117).[3]  The U.S. Trustee appointed Triad a member of the unsecured creditors committee. Dynamic/Hytorc, Nazareth and Triad were listed among RTI's 20 largest creditors. (Doc. 38).

_____

[3] Although the two creditors' names are misspelled in the schedules, no party disputes RTI's intent to list Triad and Nazareth.

(b) Nazareth

Nazareth Tool Company is a family-owned machine shop located in Mount Bethel, Pennsylvania. Marshall Taff, president and co-owner of Nazareth, testified that approximately 30 years ago, Dynamic/Hytorc began placing orders with Nazareth directly or indirectly for hydraulic tools or tool components to be based on Hytorc designs. (Doc. 282 p. 85). Some designs had a stamp on the face of the drawing which designated the drawing as a Dynamic proprietary and confidential drawing. (Doc. 282 p. 88). Thereafter, neither Dynamic nor Hytorc ever asked Nazareth to return any of its drawings. (Doc. 282 p. 186).[4]  This Court finds Marshall Taff's testimony both credible and undisputed.

For a short time, Dynamic/Hytorc submitted purchase orders to Nazareth accompanied by designs labeled both "Dynamic" and "Rapid Torc, Inc." (Doc. 282 p. 88).  Thereafter, Dynamic/Hytorc stopped ordering from Nazareth.

Sometime in 2010, Bob Aponick, who Marshall Taff understood to be the manager of Dynamic, told Taff that RTI would be ordering directly from

---

[4]  Dynamic/Hytorc offered no evidence it ever required Nazareth to sign confidentiality agreements related to  either Dynamic or Hytorc designs.

16

Nazareth in the future. (Doc. 282 p. 87 & 112).[5]  In 2012 RTI began to order parts and tools directly from Nazareth. RTI's own drawings accompanied each purchase order, at first in the form of hard copies and then later on an electronic disc. (Doc. 282 p. 95). Most of these RTI drawings contained a RTI proprietary and confidential stamp block which stated the designs belonged to RTI and could not be used without its permission.

Marshall Taff testified that he had been told and lead to believe that Dynamic, Hytorc, and RTI were all the same company. (Doc. 282 p. 102). Alternatively, Taff understood all three companies to be partners. *Id*. Consequently, in 2012 when RTI directly placed purchase orders with Nazareth containing designs labeled "Rapid Torc, Inc." Taff thought "it was a transition. They were just streamlining their system..." (Doc. 282 p. 87).

From approximately February to December 2012, RTI placed purchase orders directly with Nazareth. Each purchase order was accompanied by drawings labeled "Rapid Torc, Inc." and many drawings were stamped with a label reciting they were Rapid Torc, Inc. proprietary and confidential designs.

---

[5] Dynamic had only two employees, Bob Aponick and a secretary. (Doc. 282 p. 112).

(Doc. 282 p. 108; Ex. 18-1).

Taff testified Nazareth had thousands of drawings related to Dynamic/Hytorc and RTI purchase orders . Taff and his company had no way to know whether the designs labeled "Rapid Torc, Inc." were originally Dynamic/Hytorc designs. (Doc. 282 p. 115).

RTI paid Nazareth for some RTI orders. (Doc. 282 p. 120). However, in late 2012 when RTI stopped paying Nazareth, Nazareth stopped work on all RTI purchase orders. At the time of the bankruptcy, RTI still owed Nazareth $46,807.47.

When Atlas assumed RTI's executory contracts pursuant to the Court's Assumption Order, it agreed to pay all outstanding, unfilled orders from suppliers, such as Nazareth. (Doc. 138-1 p. 2). Thereafter, Atlas paid  RTI's pending bills and Nazareth completed the outstanding RTI purchase orders for Atlas using the Rapid Torc, Inc. designs. (Doc. 282 p. 100). To date Nazareth continues to manufacture the same tools for Atlas it made for RTI. *Id.*

(c) Triad

The president of Triad, Eric Wichelhaus, testified his company manufactured square-drive tools and power-head tools for Dynamic from 2003-2008. (Doc. 282 p. 123). During this time, Wichelhaus understood RTI was a division of Dynamic. (Doc. 282 p. 138). This Court finds Eric Wichelhaus is both credible and undisputed.[6]

In October 2011, Roger Dischert began to send RTI purchase orders directly to Triad. All RTI purchase orders had attached designs labeled "Rapid Torc Inc.," first in paper form and then electronically in a RTI hard-drive, containing all RTI's designs with the same "Rapid Torc, Inc." label. (Doc. 282 p. 125). Rapid Torc, Inc.'s name was imprinted on all tools Triad manufactured for RTI. Wichelhaus described Triad's method of tool production:

Q.  And in manufacturing any of the tools pursuant to Rapid-Torc purchase orders, did Triad reference or pull or review any Dynamic or Hytorc drawings?

A.  We worked from what we call -- each component has a job packet, so every part -- if there's 22 internal components, they go into like a square drive.  So each one of those components has a job folder which is specific to that detail.

---

[6] At the hearing, Dynamic/Hytorc offered no evidence showing a confidentiality agreement with Triad.

And in that folder would be all our manufacturing data, which would consist of sketches, drawings, the program -- hard copy of the program, tooling sheets, whatever manufacturing data would be required to produce the part.

Q.  And if the manufacturing data included a drawing, would it be the naked drawing or would there be other information recorded on that drawing?

A.  There was other information on the drawing.

Q.  And where does that information come from?

A.  That comes from Triad.

Q.  And is that just by trial and error or based on your prior knowledge?  How does that come to be?

A.  It really comes by obtaining the -- or experience in building the tools, and also becoming suspect of the drawings that are provided, because typically they were never very -- you know, let's say their effectiveness or completeness was never very strong.

(Doc. 282 p. 126).

Q.  Here's my question for you, though.  In the job packets respecting the tools that are described in these drawings in Exhibits 14, 15, and 16, and 17, do you have the original drawings that you got from Dynamic?

A.  No.

Q.  What happened to those?

A.  Well, if they're original drawings -- if --

Q.  Yeah.

A.  -- they wouldn't resemble the original drawings because they've got significant annotation on there that we developed in order to make it a functional component which ultimately becomes a functional tool.

. . .

A.  What the drawing -- again, when the drawing would go into first piece inspection to be accepted compliant to be a functional tool, that drawing now became an annotated drawing with additional information, corrections, deletions, additions.

Q.  Got it.  And that would include drawings given to you by Dynamic and drawings given to you by Rapid-Torc?

A.  That is correct.

Q.  ... if we looked in the job packet for the tools represented by these Exhibits 14,15, 16, and 17 would we see drawings and/or notes on drawings that were given to you by Dynamic?

A.  No, you wouldn't.

Q.  Why is that?

A.  Because the Rapid-Torc drawings that exist now are all that -- those folders only have Rapid-Torc information in them.  The Dynamic era was flushed, it's gone.

...

A.  We've updated the Rapid-Torc drawings with the same annotations to correct them which – you know, which really is something that we have to do on our own,

we are compensated for it.  So in effect, you know, that is -- that's our property, the way I see it.

(Doc. 282 p. 140-142).

RTI continued to send purchase orders to Triad throughout 2012. When RTI stopped paying, Triad stopped completing RTI orders. By then, RTI owed Triad $480,780.

After this Court granted the Assumption motion,  Atlas assumed RTI's unfilled purchase orders. Atlas paid Triad the outstanding  $408,780 receivable owed by RTI. Thereafter, Triad resumed work on the outstanding RTI orders. Triad used the designs labeled "Rapid Torc, Inc." and sent the completed tools to Atlas. (Doc. 282 p. 134). To date, Atlas continues to order from Triad. Atlas and Triad are cooperating to improve the RTI drawings in accordance with Atlas' specifications. (Doc. 282 p. 155).

### III. The Bankruptcy Case

(a) Dynamic/Hytorc Participation in the Rapid-Torc Bankruptcy.

RTI filed Chapter 11 on December 14, 2012. There is no dispute Dynamic/Hytorc participated in the bankruptcy case from its inception. On January 23, 2013, Dynamic filed a proof of claim for $2,634,410.82 based on

its Harris County judgment.  On April 15, 2013, Hytorc, Jetyd Corporation, and John Junkers filed a proof of claim for an unliquidated amount for "damages from Rapid-Torc lawsuit, including tortous (sic) interference, libel, business disparagement, and attorneys fees." (Proof of Claim #28-1 filed in 12-39217).

During the bankruptcy, Dynamic/Hytorc was very active, objecting to several RTI motions and appearing at every hearing. However, Dynamic never claimed RTI possessed its drawings; Dynamic/Hytorc never alleged any drawings in the possession of RTI were its trade secrets.

On April 12, 2013, Dynamic moved for the appointment of a trustee. (Doc. 126).  Before a hearing could be held,  Dynamic notified the Court that Dynamic, HyTorc, Jetyd Corporation, Jetd, John Junkers, RTI, the Official Committee of Unsecured Creditors, and Atlas had  a settlement of all pending matters. (Doc. 137).

On April 18, 2013, this Court held a hearing attended by representatives of all parties, who stated that all disputes were resolved as a result of the mediation.  Dynamic then withdrew its Motion for Appointment of a Trustee. (Doc. 126). The parties stated that the motion to compromise would be filed

within one week.

At this April 18, 2013 hearing, the Court took testimony regarding the proposed RTI/Atlas Sale Agreement (Doc. 78) and the motion for assumption and assignment of executory contracts. (Docs. 138 & 139). Dynamic/Hytorc never objected again to either motion in light of its settlement. Dynamic/Hytorc never contended that either motion was seeking to sell or assume its trade secrets. Following the hearing, the Court granted both motions. (Docs. 138 & 139). This Court relied on the testimony, evidence, and representations of the parties, including Dynamic/Hytorc and its affiliates' absence of objection and agreement to the motions.

Atlas relies on both agreed orders to show that all RTI drawings or intellectual property of any sort in the possession of RTI, Triad, or Nazareth were sold to Atlas free and clear of any claims, including those of Dynamic/Hytorc. Atlas' executive, William Thomas, testified Atlas would not have participated in the bankruptcy if it could not purchase all RTI assets, including its intellectual property, free and clear of all claims. William Thomas described the use of RTI drawings and the continued services of Triad and

Nazareth, as critical to implementing the Court's Asset Sales Order, the Assumption Order, the Settlement Order, and the Confirmation Order. This Court credits Mr. Thomas' testimony. Dynamic/Hytorc offered no evidence regarding its purposes in participating in the RTI bankruptcy, despite the presence of Patricia Sheridan, a Hytorc representative, in the Courtroom during the hearing. Ms. Sheridan was named on the pre-hearing witness list. (Doc. 217).

Dynamic/Hytorc denies its designs were sold during the bankruptcy case. In support, Dynamic relies solely on the absence of intellectual property listed on RTI's bankruptcy schedules. Samuel Samaro, counsel for Dynamic/Hytorc, argued–without evidence—his client would never have agreed to any motion had it known its designs were involved.

### (b) The Mediated Settlement Agreement approved by Court Order

On April 17, 2013, in an attempt to resolve the issues raised in Dynamic's response, the Debtor, Dynamic/Hytorc, the Unsecured Creditor's Committee and Atlas participated in a mediation before  Judge Mark Davidson.  Pursuant to the Settlement Agreement, approved by Court order, Dynamic agreed, *inter alia,* to:

- Support Debtor's sale of assets to Atlas
- Withdraw its Objection to the Sale Motion
- Accept payment of $1,400,000 on its Proof of Claim
- Accept $900,000 from Atlas for its RTI inventory
- Take no action to  defeat Debtor's plan
- Dismiss with prejudice all law suits and claims of any nature between the parties in any court.
- Withdraw the Proof of Claim filed by HyTorc, Jeytd and John Junkers (Claim No. 28)

(Doc. 207-3 p. 5).

The Settlement Agreement specifically provides:

> For and in consideration of the mutual covenants recited herein, DYNAMIC, by these presents does hereby for itself, its successors, affiliates, legal representatives, administrators, officers, directors, assigns, agents, employees, and all persons or entities in privity including trustees and receivers, remise, give up, quit claim, settle, compromise, fully release, and forever discharge RAPID-TORC or ATLAS their shareholders, assigns, officers, directors employees, agents, attorneys, representatives, successors <u>and all those in privity</u> (emphasis added) with RAPID-TORC or ATLAS, (1) of and from all rights, demands, claims, obligations, causes of action, suits, controversies, debts, dues, sums of money, accounts, variances, trespasses, extends, privileges, covenants, contracts, agreements, promises, judgments, <u>infringements, fines, penalties,</u> (emphasis original) damages, executions, at law or in equity, whether or not well founded in law or fact, asserted or which could have been asserted in the Lawsuits, Bankruptcy Case ...

(Doc. 207-3 p. 5).

(c) The APA

Debtor filed the Emergency Motion to Approve Sale of Assets Free and Clear of Liens, Claims, Interests, and Encumbrances under 11 U.S.C. § 363 on March 15, 2013. (Doc. 78). Various parties objected, including Dynamic/Hytorc, the Unsecured Creditors Committee, and Integra Service Systems, Inc. (Docs. 91, 92, & 95). Each objecting party expressed that it was in favor of a sale, but raised concerns with respect to adequate protections for unsecured creditors and  with the absence of a proposed plan.

On March 21, 2013 a hearing was conducted; the APA motion was continued until April 2, 2013 and later to April 17, 2013. Since mediation was scheduled for April 17, 2013, the Court continued the hearing until April 18, 2013. At that hearing, all parties announced their mediated settlement and withdrew all objections to the APA.

Now, for the first time, Dynamic/Hytorc argues it was never on notice that RTI had  intellectual property  which was being sold because the bankruptcy schedules listed no intellectual property. Atlas responds Dynamic/Hytorc knew the APA specifically proposed to sell all RTI assets to Atlas including:

6.   all Intellectual Property Assets, including those identified on Schedule 4.11, and all of the goodwill associated therewith, and rights to protection of interest therein under the laws of all jurisdictions;

...

13. all rights in and to Products sold or leased (including products returned after the Closing).

...

(Doc. 139 Ex. A p. 1)

4.11.1   Schedule 4.11 list and summarizes all Intellectual Property Assets, including any royalties paid or received by each member of the Seller Group, and all Contracts relating to the Intellectual Property Assets to which each member of the Seller Group is a party or by which each member of the Seller Group is bound.

4.11.2  The Intellectual Property Assets set forth on Schedule 4.11 are all Intellectual Property Assets necessary for or useful in the operation of the Business and the effective and smooth transition of the Business from the Seller Group to the Buyer Group.  Each item of Intellectual Property owned or used by the Seller Group prior to the Closing will be owned or available for use by the Buyer Group subsequent to the Closing. Except as set forth on Schedule 4.11, the Seller Group owns all right, title, and interest in and to each of the Intellectual Property Assets, free and clear of all Encumbrances and has the right to use, without payment to any third party, all of the Intellectual Property Assets.

Schedule 4.11 lists:

e.  All Trade Secrets owned and used by RTI in connection with the Business are the following: all know-how, trade secrets, confidential information, customer lists, supplier list, software, technical information, data, process technology, plans, drawings, blueprints, devises methods, formulas, protocols, and specifications whether or not patentable, necessary, or useful,  in the manufacture of all of the Products manufactured or assembled by, or for, the Business.  RTI licenses such Trade Secrets to the Belgian Seller without charge.  RTI

does not license Trade Secrets from any third party nor does it license any Trade Secrets to any third party other than the Belgian Seller.

...

i. <u>All Trade Secrets of RTI are located at the Pasadena, Texas Facility, except such Trade Secrets that may be located at vendors and suppliers of the Business.</u> (Emphasis added).

(Doc. 139 Ex. A p. 43)

In the Sale Order, this Court made the specific finding that "Atlas would not have entered into the APA and will not consummate the purchase of Debtor's assets if the Sale of Debtor's Assets were not free and clear of all liens, claims, interests, and encumbrances..." (Doc. 139 p. 3). In addition, William Thomas, Chief Legal Counsel for Atlas, testified Atlas would never have agreed to the purchase without all parties agreeing to waive all claims against debtor's assets. This Court finds Mr. Thomas a credible and undisputed witness.

<u>(d) Atlas' Assumption of the RTI executory contracts with Triad and Nazareth.</u>

On April 18, 2013, this Court approved Atlas' assumption of all outstanding RTI purchase orders for "goods ordered by the Debtor in Possession and not yet received..." (Doc. 138-1 Ex. A-2). Schedule E lists RTI's key

suppliers, including Triad and Nazareth. (Doc. 39).

Dynamic/Hytorc denies Atlas assumed any executory contracts or outstanding purchase orders with Nazareth or Triad by virtue of the Assumption Order. No evidence supports this contention.

The Court finds the testimony by representatives of Nazareth and Triad credible. The Court finds Atlas assumed and paid for all outstanding RTI purchase orders pursuant to the Court's Assumption Order.

Moreover, when this Court issued the Assumption Order in April 2013, Dynamic/Hytorc already knew RTI purchase orders to Nazareth and Triad were accompanied by RTI designs. Dynamic/Hytorc knew it disputed the ownership of these RTI designs. This Court finds Dynamic/Hytorc "lay behind the log," receiving over $1.4 million from the APA sale to Atlas for Dynamic's proof of claim and $900,000 for Dynamic/Hytorc's inventory of "Rapid Torc, Inc." labeled tools which otherwise had no market value to Dynamic/Hytorc.

Since as of January 2013 Dynamic/Hytorc knew RTI sent what it now claims were its own designs to Nazareth and Triad with RTI's purchase orders, on April 18, 2013 when this Court issued the Sale and Assumption Orders,

Dynamic/Hytorc was on notice both orders involved RTI's intellectual property of which plaintiffs claimed ownership.

Preconfirmation Dynamic/Hytorc's silence netted over $2.3 million for it and its affiliates while at the same time it believed it could impede Atlas as a future competitor by suing Nazareth and Triad post-confirmation. Consequently, the Court finds throughout the bankruptcy Dynamic/Hytorc intended to undermine the reorganization by suing Nazareth and Triad on the same designs sold by orders of this Court to Atlas.

Atlas urges that Nazareth and Triad are now being sued by Dynamic/Hytorc on the very RTI purchase orders manufactured with RTI designs and approved by this Court in the Assumption Order. The Court agrees that plaintiffs' state complaint encompasses the same RTI purchase orders assumed by Atlas pursuant to this Court's order. Although early in the bankruptcy case Dynamic/Hytorc knew it claimed ownership in the RTI designs attached to the Nazareth and Triad purchase orders, it never made that claim before this Court or notified the other parties to the case.

(e) <u>The Confirmation Order and the Amended Plan of Reorganization</u>.

The June 18, 2013 order of this Court confirming Debtor's amended plan of reorganization (Doc.163 p. 2) states:

> 3.  The Plan, its provisions and this Order shall be, and hereby are, binding upon the Debtor, any Creditor or equity security holder of the Debtor and any party provided notice of the case, whether or not the Claim or interest of such Creditor, equity security holder or party is impaired under the Plan and whether or not such Creditor or equity security holder has accepted the Plan.

Paragraph 7 of the Amended Plan (Doc. 163 p. 12) states:

> 7.1  Legally Binding Effect
>
> The provisions of this Plan shall bind all Creditors and Interest Holders, whether or not they accept this Plan.  On and after the Effective Date, all holders of Claims shall be precluded and enjoined from asserting any Claim against the Debtor or its assets or properties based on any transaction or other activity of any kind that occurred prior to the Confirmation Date except as permitted under the Plan.
>
> 7.2  Causes of Action
>
> All claims and causes of action, including but not limited to claims recoverable under section 550 of the Bankruptcy Code are hereby preserved and retained for enforcement by the Debtor after the Effective Date.  Pursuant to the mediated settlement dated April 17, 2013, by and between RTI and Dynamic Tools, Inc., HyTorc, Jetd Corporation, Jetd and John Junkers, there are no causes of action against Dynamic Tools, Inc., HyTorc, Jetd Corporation, Jetd or John Junkers.

# IV. CONCLUSIONS OF LAW

## (a) Legally binding Confirmation Order.

It is settled law that a confirmation order has the same res judicata effect as a district court's judgment on the merits. *Stoll v. Gottleib*, 305 U.S. 165, 171 (1938) (Confirmation order barred subsequent state court case challenging jurisdiction); *Eubanks v. FDIC*, 977 F.2d 166 (5th Cir. 1992) (Res judicata effect of confirmation order in husband's bankruptcy barred wife's subsequent law suit against banks); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1053 (5th Cir. 1987) (Confirmation order extinguishing liability of third-party guarantor is res judicata on subsequent state suit on same guaranty).

Federal common law determines the preclusive effect of a federal judgment. *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008).  A final judgment on the merits of an action is res judicata and "precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

To assess the preclusive effect of a prior judgment on a  second

proceeding, the Fifth Circuit considers whether: (1) the parties are the same or in privity; (2) a court of competent jurisdiction rendered the judgment in the first proceeding; (3) there is a final judgment on the merits; and (4) the same claim or cause of action was involved in both proceedings. *In re Southmark Corp.*, 163 F.3d 925, 934 (5th Cir. 1999); *Swate v. Hartwell*, 99 F.3d 1282, 1286 (5th Cir. 1996). The second and third factors are not in dispute. This Court had jurisdiction over the bankruptcy and the orders at issue are final. Consequently, the first and fourth factors remain: are the same parties or their 'privities' involved and is the same claim or cause of action involved in both proceedings.

Regarding the question of parties, Dynamic/Hytorc argues its state case is against Nazareth and Triad, not RTI or Atlas. However, there is no question that all four parties participated in the bankruptcy.

Moreover, even assuming Dynamic/Hytorc was not required to sue Nazareth and Triad during the bankruptcy, Atlas urges both suppliers were 'in privity' with RTI because all designs accompanying RTI purchase orders came directly from RTI. The courts recognize 'privity' is broad concept which requires consideration of the surrounding circumstances involved in the dispute.

34

*Nevada v. United States*, 463 U.S.110,129 (1983); *Baylor v. HUD*, 913 F2d 223, 225 (5th Cir. 1990). RTI was in a position to adequately protect the interests of Nazareth and Triad. *Eubanks v. FDIC*, 977 F.2d 166 (5th Cir. 1992); *Russell v. SunAmerica Securities, Inc.* 962 F.2d 1169, 1175 (5th Cir. 1992) (Relationship between debtor and its purchaser was sufficiently close as to bar subsequent suit against purchaser). The first factor is satisfied.

To consider whether both proceedings involve the same claim, the Fifth Circuit follows the transactional test of the Restatement (Second) of Judgments, § 24. *Id.* This Court must decide whether the two proceedings are based on "the same nucleus of operative facts." *In re Baudoin*, 981 F.2d 736, 743 (5th Cir. 1993) (quoting *In re Howe*, 913 F.2d 1138, 1144 (5th Cir. 1990)).

This Court finds Dynamic/Hytorc was on notice that RTI intended to sell its intellectual property to Atlas. The Settlement Order required Dynamic/Hytorc to support the Sale motion. On April 17, 2013, the day of the settlement, the proposed APA had been on file for approximately one month. Atlas paid Dynamic/Hytorc approximately $1.4 million dollars for agreeing to settle all its claims against RTI. On the date of the Settlement Order, Dynamic/Hytorc knew

it claimed ownership of the RTI designs attached to RTI purchase orders sent to Nazareth and Triad. (*See* New Jersey lawsuit, Atlas hearing Ex. 3).

Dynamic/Hytorc also knew Atlas intended to carry on the RTI business with Nazareth and Triad. The Sale Order specifically sold all RTI intellectual property to Atlas, including any intellectual property "in the possession of RTI's suppliers." (Doc. 139). Nazareth and Triad were listed among RTI's suppliers. Dynamic/Hytorc cannot pretend RTI had no intellectual property when one month after confirmation, plaintiffs sued Nazareth and Triad alleging RTI gave them RTI designs stolen from Dynamic/Hytorc.

The Assumption Order permitted Atlas to assume RTI's outstanding purchase orders, which Dynamic/Hytorc knew included orders from Nazareth and Triad based on RTI designs. For these reasons, the Court concludes that both the bankruptcy and the subsequent state suit involve the same nucleus of operative fact, namely the ownership of RTI intellectual property which Dynamic/Hytorc claimed as its own trade secrets.

(b) Settlement Agreement Release.

The Settlement Agreement is interpreted according to ordinary principles

36

of contract law. Under Texas contract law, a court's "primary concern ... is to ascertain and to give effect to the intentions of the parties as expressed in the instrument." *Citizens Nat. Bank in Abilene v. Texas & P. Ry. Co.*, 136 Tex. 333, 338, 150 S.W.2d 1003, 1010 (Tex. 1941). The contract must be read as a whole. *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex. 1994).

Atlas argues the Settlement Agreement required Dynamic/Hytorc to release any claims Dynamic/Hytorc had against Nazareth and Triad because they were in privity with RTI. The mediated settlement agreement was contingent upon completion of the APA between Atlas and RTI. (Doc. 139).

Dynamic/Hytorc responds, under Texas law, "in privity" release language only covers parties named or identified in the agreement. *McMillen v. Klingensmith*, 467 S.W.2d 193, 196 (Tex. 1970). A tortfeasor must be described with particularity in order to extinguish its liability. *Duncan v. Cessna*, 665 S.W.2d 414, 422 (Tex. 1984). This is a correct statement of Texas contract law. Consequently, the Settlement Agreement release does not extend to Nazareth and Triad since they are not formally named in the release paragraph.

Nevertheless, the Court notes by the language of the Settlement

Agreement approved by the Settlement Order, Dynamic/Hytorc specifically waives all claims to any RTI assets and agrees to support both the APA and the RTI reorganization. The Settlement Agreement is unambiguous. Its terms are plain. Since Dynamic/Hytorc knew early in the bankruptcy, months before the Settlement, RTI used designs claimed by Dynamic to place purchase orders with its suppliers, the Court finds Dynamic/Hytorc waived any claims to ownership of RTI intellectual property.

During the bankruptcy, Dynamic/Hytorc was represented by local counsel known to this Court to be ethical, conscientious, and competent. In all appearances in the bankruptcy, Dynamic/Hytorc's local counsel and his firm represented their client zealously. The Court finds Dynamic/Hytorc agreed to the settlement and reorganization knowing it had claims against the RTI intellectual property which it intended to assert post-confirmation against RTI's suppliers.

Dynamic/Hytorc is an internationally-recognized seller of torque wrenches. Dynamic/Hytorc is a sophisticated party in the commercial equipment industry. Parties are held to their bargains, especially sophisticated parties such as Dynamic/Hytorc. *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins.*

*Co.,* 174 F.3d 650, 671 (5th Cir. 1999).

## V. Unraised but relevant issues.

### a. The Anti-injunction Act.

The Anti–Injunction Act provides "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. A federal court may only enjoin a state proceeding on rare occasions. This 'relitigation' exception "was designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court. It is founded in the well-recognized concepts of res judicata and collateral estoppel." *New York Life Ins. Co. v. Gillespie*, 203 F.3d 384, 387 (5th. Cir. 2010), quoting *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147 (1988). Although the parties have not raised the Anti-Injunction issue, to grant Atlas' motion is arguably to enjoin further litigation in state court. In an abundance of caution, the Court finds that the exception to the Anti-Injunction Act applies. The rulings in this matter are in aid of this Court's jurisdiction.

(b) Judicial estoppel.

The purpose of judicial estoppel is "to protect the integrity of the judicial process." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). Parties are prohibited from deliberately changing positions "according to the exigencies of the moment." *United States v. McCaskey,* 9 F.3d 368, 378 (5th Cir. 1993).

In general, a court looks to: (1) whether the party's position is plainly inconsistent with one taken in a prior proceeding; (2)  whether other parties relied on the prior position; (3) and whether the change in position was intentional or inadvertent. *Love v. Tyson Food, Inc*., 677 F.3d 258, 264 (5th Cir. 2012).

Based on the Court's previous findings, namely: (1) Dynamic/Hytorc intentionally failed to raise its ownership claims to RTI's intellectual property during the bankruptcy and it now claims RTI's designs are its trade secrets; (2) the APA and reorganization were integrally related to  the Court's approval of the Dynamic/Hytorc/Atlas settlement; (3) Dynamic/Hytorc purposely accepted payment from Atlas, while post-confirmation, it intended to sue Atlas' suppliers, Triad and Nazareth, the Court finds that judicial estoppel is necessary to prevent

further bad faith acts by plaintiffs which undermine the reorganization and to protect the integrity of the judicial process.

## VI. Conclusion.

It is hereby ORDERED that Atlas' motion is GRANTED and Dynamic/Hytorc's motion is DENIED. Dynamic Tools, Inc. and Hytorc, a division of UNEX Corporation, are precluded from proceeding with the lawsuit styled *Hytorc, Division of UNEX Corporation and Dynamic Tools, Inc. v. Triad Tool Co. and Nazareth Machine Works, Inc.*, originally filed in Superior Court of New Jersey, Bergen County, Case No. L-5514-13, now pending in the United States Bankruptcy Court, District of New Jersey, New Division, Case No. 13-00106, until further Order of this Court.

Signed this 31st day of December, 2014 at Houston, Texas.

Karen K. Brown
United States Bankruptcy Judge